17-1607 Axia NetMedia Corp. v. Mass. Technology Park Corp. Mr. Volk. Good afternoon, Mars. If I could reserve two minutes for rebuttal. Yes. Thank you. Your Honors, Judge Hellman in the District Court made an error in issuing the injunction in this case, and he used the wrong standard. The reason he used the wrong standard is this is an affirmative injunction. This is not a prohibitory injunction, but it is an affirmative injunction, and it was an affirmative injunction in that Judge Hellman ordered a number of things that were not the status quo by any means. He ordered extra-contractual liability obligations on the part of Axia NetMedia beyond the $4 million guarantee cap, which is expressly in the agreement that says there is no liability under this agreement once $4 million is paid. Judge Hellman ordered services to be provided to the network that cost $163,000 a month for a period of a year. I'm sorry. I'm not following you, and let me explain my difficulty. Okay. Even if you view the transitional services as a sort of separate argument, why wasn't the preliminary injunction requiring that to be served a maintenance of the status quo? Okay. It was not a maintenance of the status quo. Well, but your client had altered the status quo a little bit through its corporate transactions that led to the need for some of these transitional services. Under the contract, Your Honor, the transitional services only kick in if there is a termination of the network operator agreement, which never occurred, or an expiration of the network operator agreement. Those only come into play they're in Section 8 of the network operator agreement. They only come into play if MTC terminates the contract or the contract expires of its own terms. And those transitional services do not come into play before that. And so what Judge Hellman did was Judge Hellman determined that he didn't have to follow Winter, the Winter case, and find a likelihood of success on the entire merits of the case, all aspects of the case, which is what the Supreme Court has said. You're losing me on that. Let's assume two parties agree that if we have a dispute, we'll go to arbitration. And we're also going to agree that until the arbitrator decides it, we'll both keep performing. That's our separate problem, that we'll perform during the period of our dispute. And then one who breaks that promise because it stops performing while there's a dispute. You seem to be saying that a federal court can only enforce, provide specific performance for that promise if the federal court first finds what the arbitrator is likely to rule in the arbitration as to the ultimate merits, which seems to strike right at the heart of the arbitration agreement, particularly where the promise to perform is not contingent upon having a likelihood of success in the arbitration. So you lose me on that argument right at the outset. With respect to the continuing performance obligation, that continuing performance obligation by its express contractual language in the network operator agreement, that is expressly limited to the network operator. Now you're making a different argument. I'm concerned about your argument where you said that the district court used the wrong standard because it failed to assess the likelihood of the outcome on the merits of the substantive dispute. That's your principal argument in your brief, and it's one you've already started off this morning. That argument isn't contingent upon whether it's the network operator or the guarantor. That's an argument you're making that to enforce the performance guarantee, you have to assess the merits, and that's where you lose me. So do you want to hear about the continuing performance obligation, or is that the question? No. Answer the question. We can read it back to you. I think your principal argument in your brief, and what I heard you starting to say, was that the district court used the wrong standard because the district court failed to assess the likelihood of success on the merits of the underlying dispute. That's correct. That's what I heard, too. That, to me, says that the district court would have to, in effect, predict what the arbitrator was going to do and opine on that, and it would mean that the specific performance that we will perform while we are in a dispute promise would not be enforceable if a court felt the dispute might go the other way, which undercuts it. Well, the judge actually did that. He made determinations that the arbitrator should make. He determined that we should, that my client, Axionet Media... So do you now, let me take this a piece of, are you now saying that the proper approach is the district court should not make any determination that the arbitrator might make? Should not do that. Okay, well, if he should not do that, then how could he make an assessment as to the likelihood of success on the ultimate merits of the dispute, which are going to be decided by the arbitrator? Well, what he did do was he interpreted the contract, and he imposed an injunction against my client, for example, that services of $163,000 a month... Now you're getting away from the standard issue. You're getting up to the merits. But that's how he did it. And didn't he invite that by bringing the declaratory judgment in the first place, which necessarily requires determinations that would be up to the arbitrator if the arbitration stage eventuated? Well, we didn't have the right to arbitration, Your Honor, at that point in time. We had to go to court. That's the only option. Arbitration was strictly limited to MTC, not to my client. Maybe I was wrong. Your client could not call for arbitration? We could not call for arbitration. So your client could cease performance, in which case arbitration would be the remedy? I didn't hear you. If your client and its subsidiaries ceased performance, then arbitration would be the next step. No, you could go to court. MTC had the option of going to court. Was that express? That's express. I have no right to go to arbitration. MTC did exercise its option to opt to arbitration. They did, Your Honor. And what puzzles me is it seems that ever since that moment, it seems you've been kicking and dragging your heels about getting to arbitration. You've resisted it. Had you not resisted arbitration, this whole dispute would have been over by now, and you would have been out of your conundrum that you're coming to us about because we would have had a final decision from the arbitrator. We couldn't go to arbitration. Well, you could when they demanded it. They never brought this case to arbitration, Your Honor. They have until this day. What they filed in arbitration, they didn't remove the case to arbitration. They just filed a breach of contract claim against us. That's right. That was in July, and they didn't even outline their claims until December. Counsel, it's in arbitration right now, isn't it? I understand that, Your Honor. All right. So back to my question. In July, they demanded arbitration. It seems to me, if I look at the record that's before us, that at every point since July, they have been trying to move towards arbitration, and you have been trying to forestall arbitration. Now, I'm not saying you don't have a right to present arguments, but in terms of your equitable standing to complain about having to perform because you might go over the $4 million when you yourself keep pushing back the date of the arbitration. That's not accurate at all, Your Honor. We haven't pushed back anything. We actually went to a hearing and demanded arbitration within 60 days at the first instance. We said it has to be completed within 60 days, and we wanted to do that, and that hasn't been done by the arbitrator, and the delay was caused by MTC in failing to even articulate what their claims were. They waited until December. So you're saying the recent submission we got from the other side describing the history of the arbitration is not accurate? It is not accurate in the least. Absolutely not accurate. I asked the first time we met with the arbitrator, and I said I want the arbitration completed within 60 days. So with respect to the continuing performance obligation, it's our position there was an error of law and an error of fact by Judge Hellman. That continuing performance obligation is limited expressly by its terms to the network operator. The network operator has remained KCST, and my client, we are not the network operator. We couldn't legally be the network operator. What do you say about Article 2 where it says that you, you're the guarantor, right, and the network operator has an obligation to perform during the course of the dispute? That's true. They have been performing, and we have covered any expenses under the injunction. We covered any expenses. Anything was paid, but the obligations of the network operator are laid out in the network operator agreement. But they don't entail Section 11. Section 11 is exclusive to dispute resolution processes. But if it's an obligation of the network, here's where I'm having trouble. It seems to me it's clear that performance during the course of a dispute set forth in Article 11, 11.2 I think it is, is an obligation of the network operator. It's not delineated that way in the agreement. It says that is only, it's a dispute resolution procedure between whoever the network operator is and MTC, and we guarantee contemplated we might become the network operator sometime, but we never did. Isn't the network, didn't KCST agree that it would perform during the course of the dispute? Yes, they did. Okay. So KCST itself, put aside their client, has an obligation to perform during the dispute. And they are. Okay. But then you in Article 2 of the guarantee said you promised to perform all obligations of the network operator. That's true. That's part of your guarantee. So if they had an obligation to perform and they stopped, didn't you have an obligation to perform? That's only for the dispute resolution procedures that are incorporated in. They only apply to the network operator, and it's not actually one of the listed obligations under the network operator agreement. It's just listed as a dispute resolution. The obligations are listed separately in the contract as to what KCST must do. So you're saying when we look at Article 2-1 and we see all such obligations of the network operator, we should read as excluded from that any of the obligations that are set forth in Article 11 of the network operator agreement? Yes, because they are not, the obligations are listed separately in the network operator agreement. So there is ambiguity there, and the continuing performance obligation under those circumstances shouldn't be read narrowly. And you have to read it consistent with the guarantee agreement where there are other obligations in there. All of those dispute resolution procedures actually in that media could never participate in because they're not the network operator. And it is assumed that if we became the network operator, then those dispute resolution procedures would apply. Can I ask you about something else? Yes. You've come in here with a sort of wholesale attack on the preliminary injunction, but you did not explicitly ask us to modify the injunction in any way. What I'm curious about is suppose the arbitration is delayed and you go through the burn rate on the money to the point where you're approaching the $4 million limit. Do you have the opportunity then to go back to the district judge and say there's been a material change in conditions and we ask that you find that at the $4 million figure, any continuing obligations we have under the injunction are over with? We do have that opportunity. In fact, I asked Judge Hillman to do that in his ruling, and he declined to do so. Well, we don't like to make hypothetical rulings. And if that were to happen and you were to go back and seek a modification of the injunction, could the issue then of the net income that the operator takes in be part of that proceeding? I don't believe it could be at all, Your Honor, because we don't receive any benefit of that money. We don't own KCST. No. You're not answering the substance of my question. The guarantee itself refers to a $4 million figure, but it doesn't seem to refer to a net figure or a gross figure or anything else. Do the profits, does the income that come in to the operator from the subscribers, does that just get passed on directly to the technology center? What happens, Your Honor, is all the money that comes in is going to, the money goes to MTC eventually. That's the eventual part that I'm asking about. It goes to MTC because they didn't build the network, and as a result it was a financial loss from day one. I wish you would answer my question. The money doesn't go to my client, and it's used in the course of business. You put your client to the side. Does the money go to the operator, and is it used to offset expenses? It is, Your Honor. Thank you. Yes, it is. It's used by KCST. So is KCST now performing? They're performing in Chapter 11. They've been performing in Chapter 11. So then what's your problem? If they're performing, you don't need to do anything. Well, we're paying expenses, Your Honor, under the injunction. We're getting close to the, we're moving towards the $4 million. You only have to pay if they're not paying. That's right. So you're telling me they're not paying, i.e. they're not performing. Yeah, they're not paying everything. Okay. So let me go back to my first question. Is KCST currently performing? In full, no. Okay. And is that, they're performing, give me some sense of the magnitude as to what they're not doing. Well, they're not paying a lot of major expenses that come in. They're being paid by Accionet Media. Okay. So the thing your client is having to do now is funnel money into the operations to cover the expenses. That is correct, Your Honor. That would not seem to create any FECC issue. That wouldn't, Your Honor. So has that issue dropped out of the case? The FCC issue is not. The injunction as provided by Judge Hillman requires Accionet Media and its subsidiaries to provide administrative, technical, and other services to the network. But the subsidiaries were providing those services before, we're told in the record. Not to the network. They provide them to KCST. Well, can't they just provide them to KCST? They can, but if KCST is not in the picture, they cannot provide those services. I thought KCST was in the picture now. They are, but they might not be at any point in time. Okay, but as long as they remain in the picture, and I'll go back to my question, isn't this whole FCC issue just potential or moot? It won't arise until KCST stops performing in some way. Correct. Thank you. Correct. Doubtless on that. You've reserved two minutes. Okay. Is my time up? Yes. All right. Thanks. May it please the Court, my name is Robert Kaler. I'm counsel for the Massachusetts Technology Park Corporation, which we refer to as MassTech, and I was their counsel in the district court. If I understand the heart of the court's concern, in this case, it's the interplay between a district court's injunction and parallel or overlapping arbitration proceedings, and I appreciate that. The judgments that we made, that I made in the district court, about how to respond to the declaratory judgment action, what I argued for and what I didn't, reflected my best effort to understand prima paint, the cases governing arbitration, the cases governing when do you waive arbitration, if you pursue it in the district court, and our task when confronted with the declaratory judgment action was to try to balance those interests and inform the court as best we could about how the law said they should be balanced. The past is prologue in this case more than anything else, but I won't try to review all the facts going back. It's more or less in the briefs. We were just told that what you stated in your letter to us about the history of arbitration proceedings is not accurate. I don't know what part of it is not accurate. Most of it is publicly available on the record. In essence, yes, Mr. Volk did say in December of the first hearing, we want arbitration in 90 days, but then in the next breath he began arguing for depositions and now has submitted five motions of a pretrial nature, and there was general consensus that we couldn't have the arbitration decided within 90 days once it got started. I thought you demanded it in July. We did, and again, I'm remiss in not sort of running through very briefly where things stood. But I demanded it in July at a time when AXIA was resisting arbitration. Very briefly, on February 1st of 2017, if we start there, we were in the state court because it had been two years since the state court entered its 2014 injunctions and they wanted to know what was happening. And Mr. Volk said to them, I think this is at page 300-88 of the appendix, this is the transcript, a verbatim quote, we're going to file arbitration this month. So this time a year ago, we were waiting for an arbitration to be filed. I represent a public authority. Yes, we had counterclaims, but we weren't going to initiate the arbitration, even though it had been ordered in 2014, because we didn't want to litigate and we knew the claims that they were arguing about the number of CAIs were, to our mind, frivolous. And they'd never pursued them in two years. But, of course, the superior court wanted to know what's happening. And Mr. Volk specifically said in the transcript, we're going to file later this month. Then at the end of February, to come forward to the July arbitration filing, at the end of February, they changed the name to KCST. I should have realized maybe what was about to happen. I didn't know. It occurred to me they could file for bankruptcy, but what company would do that with a subsidiary? So I figured I couldn't do anything about it. But the name change did have an effect on the marketplace, because it changed in the Internet. We began getting all kinds of complaints. Judge Sanders, when she issued the preliminary injunction, did not intend to supervise performance of the network operator agreement, so I had never gone into court when there were routine violations to say, well, the injunction's being violated. But this time it was significant, so I sought an emergency hearing on March 21st. We filed a motion saying, okay, change the name. Our marketing expert says this is significant. And we got a hearing set for March 24th. And then on March 22nd, KCST, formerly Axios, filed for bankruptcy. No notice to the Commonwealth or to Mass Tech. And on the same day, the parent company filed a declaratory judgment action. I didn't get a phone call, no email, no notice, and didn't find out until my client called me and said, gee, they filed for bankruptcy. And then the next day said, and they filed a suggestion of bankruptcy, which froze the entire state court proceeding. And then at the same time, they filed a declaratory judgment action. This is a long way around saying how did we come about filing the arbitration demand we did in July. Well, we were confronted with a situation on March 22nd with the bankruptcy stay froze the state court action, and the guarantee had been disavowed. The declaratory judgment was filed as a cover action, and it was publicly announced 13 weeks before the network goes down if we can't refinance it. And Mr. Darr filed an affidavit for KCST saying one of the purposes of filing the bankruptcy was to try to consensually renegotiate the network operator agreement. We felt we were under the gun. It's an interesting concept of consensually renegotiating an agreement. We were under the gun, and there was a lot of political pressure. I was responsible for dealing with the situation. And they filed the DJ action in a situation where the guarantee language, the guarantee language says you can file, either party could sort of file in court, but it gave Mass Tech the unilateral right to say no, we want to go to arbitration, which implicitly meant Mass Tech had to have noticed that somebody was going to do something in terms of filing suit. It would be silly to file suit in that situation and not give notice, but that's exactly what they did. We wanted arbitration because it was more efficient and faster, and that's what was contemplated. So is it now set for May? Yes, the hearings are set for May. How we got to that point is our immediate response was to file a motion to compel arbitration in accordance with the continued performance provision. It was a bit like deja vu all over again, to paraphrase Yogi Berra, and we filed with it a preliminary injunction application. The former is arguably not immediately appealable. The latter is a decision on it. I did exactly the same thing I had done in the state court two years earlier, except the state court rule 65 lets you refer to another document, and that's why Judge Sanders could just say comply with your obligations, in that case under the network operator agreement. It was only against the subsidiary in the state court action. So we filed both those motions, and Judge Hillman was very patient. He listened to all the arguments that were being made, and it was a confusing situation, and we kept at it for a month. At that time, there was discussion about, well, why don't you mediate? And I made a mistake. I said to him in the court, well, I don't want to mediate, without explaining that I'm happy to mediate for the guarantee it requires it, but not with a gun to my head, because that's not what the guarantee contemplated either. So I had to explain that later, but the bottom line is we proceeded with the motion to compel arbitration, and there's a 60-day period where you had to demand mediation. I waited to do that until the temporary restraining order entered, because I didn't feel my client should be forced to go to mediation. But as soon as the D.I. went in on April 24th, I sent a letter saying we want to mediate, starting the 60-day clock. The 60-day clock. I know this has been a long period, and you have a long history, but we have some other questions we'd like to ask. I'm sorry, Your Honor. I'll just conclude. When that 60-day period expired, I filed a demand for arbitration in July, but Trigley doesn't do anything with a demand unless the other party agrees, or you have an order, and we didn't get the order until the end of August. I apologize, Your Honor. Okay. What do you have to say about the question of whether the FCC issue has dropped out of the case at this point? Well, with the greatest respect from our standpoint, the FCC issue was never really in the case or should have been, but that's just a retort, and I don't mean to be clever on it. But the frustrating thing from our standpoint was that in 2000… I think the question is, has it dropped out of the case now? If it was, assume it was in the case, but has it dropped out of the case? Well, it hasn't dropped out in the sense that Mr. Volk is still arguing it. So in fairness… Is KCST performing or purporting to perform? Yes, KCST is purporting to perform, but that's not his argument, if I understand it correctly. What he's saying is we can't perform under the guarantee because it would violate the FCC rules, when the injunction, as the court, I think, properly pointed out, only required it to do what it was already doing, and the FCC approved that in 2016 when they transferred KCST into a trust. The thing that puzzled me most about the order was it seems to leave the other side in the position of having to pay more than $4 million. If I understood it, if counsel decided to arrive here with a check for $4 million minus what they have legitimately spent under the guarantee to date, they would, under the agreement, be done. That's the one part of the order that we had a question mark in our own mind about. It wasn't part of the draft order that we submitted as a proposed order. Justice Lynch's comment to counsel seemed to be the way that I sort of resolved it, which is that if and when they got to the $4 million, apparently they're at about $2 million now, and the $163,000 a month is being paid by KCST to the parent company, so the argument about the bond is kind of irrelevant there. But if they reach that point, they can always go in and move to modify the injunction. The basis, the rationale for it, the best rationale that I can come up with to defend that is it's an exercise of discretion in a situation where the party who's the subject of the injunction has already more than shown its bad faith. It's akin to a landlord wanting to have access to his premises, and under the lease he only gets it Monday through Friday, but there's a union or there's some sort of violent problem, and to cure the shutout that's occurred, the court lets them go on a Saturday. There's a breach of implied covenant claim that we've asserted in the arbitration, and when Judge Newman asked me, well, what do you say if they just hand you a $4 million check, can they do that? I argued then, as I do now, that it would be a breach of the implied covenant of good faith and fair dealing, taking into account the parole of evidence and the testimony of Mr. Hollihan that the court heard, which was to the effect that the intent of the guarantee was there's a $4 million cap, but the intent was to provide Mass Tech with a decent interval, to paraphrase Frank Stam's book about the Vietnam War, a decent interval, a time within which if the operator went out of business, bankruptcy problems, Mass Tech could get someone else in there. And if the guarantee of the network operator agreement was intended to provide cover for that, it meant that, among other things, the guarantor had to be prepared to step in and provide services transfer assistance. What that exactly means, whether they would have to be paid for it, if the $4 million cap had been reached, for example, one could say you'd be paid for it, the main services transfer assistance needed was access codes to the network and the ability to just connect in. You don't need that much, and it honestly wouldn't be fair under the guarantee for the injunction to be interpreted as saying you have to provide us with a lot of money. Nor would I ever argue to Axionet Media if they said, look, we paid the $4 million, we want you to pay us a reasonable amount for services transfer. That's how I interpret that provision. What do you say about the argument that's made regarding they have no obligation to pay for transfer services unless there's been a termination under Article A? Well, the issue is moot in terms of transfer. In a sense I agree because the bankrupt debtor is in this incubation period where under bankruptcy law they don't have to yet assume or reject the contract. I've appeared in the bankruptcy court. I'm pulsing and arguing for assumption or rejection as soon as possible, but they have claims and they're sort of delaying that. But the issue is we can't step in and take over the network now because they're in bankruptcy. He's right in a sense. There isn't a termination in services transfer assistance. Services transfer assistance, however, includes preparation for transfer, and to some extent they're doing that now, in other words, giving us access to the network. There are some sort of gray areas here, but as we try to see through the fog, the intent of the services transfer assistance provision was to allow us to prepare for like an emergency transfer. If they suddenly convert to a Chapter 7 liquidation, and I'm not a bankruptcy expert, although I appeared there in this case with my partner who is, if they convert suddenly, they can do it very quickly, so that services transfer includes some of the things we've just done. If I had to calculate where does the one year begin, I'd probably calculate it as January because that's the first time that we were able to connect into the network after a series of motions to compel compliance with the injunction. If there's a theme to this case, it's that this is a case about an attempt to exercise leverage that the parties specifically intended in their agreements to protect against. We talked about a utility grade continued performance provision. There are some contracts that any of us could enter into. If I enter into a contract with someone to sort of operate my house, it's a great contract for me, but on the other hand, if the person has the access codes to the alarm system and controls much of the billing and has been running it, I'm no more billing, so that if we have a dispute, they have the leverage of being able to shut down everything, and that's leverage you try to deal with with continued performance provisions. On this issue of the possibility of exceeding the $4 million mark, I do think that it may well be possible to go back to the district judge. Should that happen, but I could see why he would not want to entertain that possibility on an assumption that the arbitration would proceed promptly, and also on an assumption that there would be a dispute about when the $4 million had been reached, if ever, and what counts and what doesn't count toward the $4 million figure. It seems that the arbitration may well be concluded before that sort of danger zone is reached. Yes, and I agree with the court completely, and we went through the same analysis. It's the only part of the injunction. I believe it's within the court's discretion because it doesn't necessarily result in any untoward effects for the reasonably foreseeable series of events that follows. We commenced the arbitration in July, got the order at the end of August, did all the things that my status report points out. KCST has counsel. We furloughed into the arbitration, which didn't really delay the arbitration. I felt obliged to do it because the subsidiary of Accident Media has its own adversary proceeding in the bankruptcy court, and we didn't want two separate proceedings. But they furloughed in pretty quickly because we happened to have a motion scheduled, and it was all done fairly quickly. So by early July, they were consolidated in the arbitration, granted a motion to consolidate. We've been pushing for here. The parties have generally agreed on May. The current dispute, ironically, Accident Media is spot on a whole series of motions, and I'm fighting discovery a little bit at this point. Maybe one of the few times I've done it, only because arbitration, it does allow for discovery. They're within their rights to argue for it. But we've also reached a consensus that it's May. And from our standpoint, we have a replacement operator standing by. I say that without prejudice to KCST's rights. If they came in with adequate assurances that they'd perform the contract up to 2023, I can't do anything about it. We were constrained by a series of interrelated rules. One of the things I was concerned about in the district court proceeding was not waiving our right to arbitrate the dispute on the merits. So I had the frustrating situation of hearing again and again and again, we didn't get what we bargained for, the CAIs were not. And perhaps I made a mistake. I tried to stay away from the merits as much as possible. I did let slip the state, well, how can you say that when the contract says this? And then Judge Hellman put it in his order. I accompanied only very gently from the district court's decision. In that area, I might have said, well, Prima Paint says that's like a fraudulent inducement claim and that goes to arbitration, so that's not really an issue. He addressed what I had said. But the result was correct. The result was, so how do you navigate in this situation where you have an obligation to but it seems to me the obligation was inherent on our part to pursue the arbitration aggressively. We were not entitled to seek an injunction and sit on it. And we were not entitled to delay. But we moved with all deliberate, well, I don't want to say all deliberate speed. We moved as quickly as we could. So my other question has to do with the bond. The way I understand the bond, it is tied to the preliminary injunction only and not to the outcome of the arbitration. Yes. Okay. I think that's right. Why do we have a preliminary injunction here? Shouldn't this, this type of issue, shouldn't it be resolved with a final judgment one way or the other? What's left to be done on the preliminary? Usually when you have a preliminary injunction, you then mark up a hearing to hear the final. The preliminary injunction, the final in the district court would be confirmation of the arbitration award, as I see the situation. You have these situations. In other words, then, the injunction to continue to perform until the arbitration is done is final. I'm subject to that $4 million figure. Subject to the $4 million cap. I mean, in a sense, a preliminary injunction is always final. The injunction itself doesn't say it's subject to the. Well, it says with respect to almost all of the. Two of the issues, but not with the one that's creating the problem. But let me put it this way. Is there any plan to be back in the court on the injunction prior to the arbitration? No. So effectively the injunction for all purposes as far as the issue of duty to perform pending dispute resolution has been finally resolved, which seems you've just got the wrong label on it. Perhaps. They are planning to argue in the arbitration that the whole issue of the continued performance obligation should be revisited. I confront that issue in the arbitration only because they mentioned it. And the arbitrator pointed out, well, you know, I have discretion for preliminary relief. And I pointed out that arguably, of course, you would. But arguably the issue is waived because they litigated it in the district court. And it cannot be right. There are imponderables here. But the judgments that I made at the time were we have a contract with a continued performance provision and a provision for injunctive relief. They filed suit very quickly and presented us with a crisis. There was no way to get an arbitration panel convened in the 13 weeks that we had before the financing expired. So we exercised the rights given us under the contract with a continued performance provision and a right to go to court for injunction even if you're going to arbitration. And as I read the contracts, they seemed to permit that. I'm not sure I've answered Judge Kayaba's question adequately. I'm not sure I fully understood it, to be perfectly honest. I think your time is up. Yes. Thank you.  Thank you, Your Honor. Thank you. Your Honor, there is no hearing in May. I challenge Mr. Kayaba to produce anything. I filed the latest with the court last week, and they asked for dates all the way through July. The arbitrator did. So this could take place in May. It could be in July. It could be in June. Well, if they're ready in May, why aren't you? Pardon me? If they're ready in May, why aren't you? I thought you were the one that wanted to get to the merits. We did. We wanted to, and this was delayed by MTC. They delayed everything over a month by asking to hold up the mediation or the arbitration until they could get some authority from the bankruptcy court. We had to wait almost a month for the bankruptcy court to make a ruling to see if KCST and MTC could have their disputes decided by our arbitrator. So they delayed it well over a month by doing that. We asked the court not to do that. We opposed it and wanted to go ahead. That didn't happen. There is a need for it. What is the answer to Judge Kayaba's question? If they can be ready in May, regardless of the history, why can't you be ready in May? The reason I can't be ready in May right now is I've been ordered by another judge to go to trial. That's the only reason. Unless I get that moved. Okay. So that's because there was a delay in setting the hearing dates. A judge ordered and specifically ordered the trial. It was in state court? Yes, it is. So that's the only reason. You've got 30 seconds left. With respect, the court should order a bond for the additional money beyond the $4 million. It's extra contractual. You did not ask for that in your appeal before this court. I looked for it. You have conceded that, yes, you could go back to the district court should the eventuality arise. Your Honor, I believe we did do that. We addressed that in one of the sections of our brief. All right. I'll take another look. Your time is up. Thank you.